**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X

AMEER HASARAFALLY,

                      Petitioner,

    - against -

UNITED STATES OF AMERICA

                     Respondent.
-------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/10/12

**OPINION AND ORDER**

**10 Civ. 3457 (SAS)**

**S1 05 CR 401 (MBM)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

       Petitioner Ameer Hasarafally, proceeding pro se, petitions this Court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2255 ("section 2255"), to vacate, set aside, or correct his sentence.[1]  On April 19, 2006, Hasarafally was convicted of conspiracy to distribute cocaine, in violation of 21 U.S.C. § 846, following a three-day jury trial.  On September 6, 2006, Hasarafally was sentenced to ninety-six (96) months imprisonment, to be followed by five years supervised release.

       Hasarafally asserts two grounds in support of his original Petition. *First*, he claims that his Sixth Amendment right to the effective assistance of

---

[1]    *See* Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (the "Petition"), submitted March 18, 2010.

1

counsel was violated when his lawyer failed to: (1) object to certain hearsay statements made by a non-testifying co-conspirator that were admitted into evidence; and (2) call that co-conspirator as a witness at trial.  *Second*, he claims that his Fifth Amendment right to due process was violated when the sentencing judge, former Chief Judge Michael B. Mukasey, stated at the sentencing that Hasarafally is subject to removal upon completion of his term of imprisonment.[2]  In addition, Hasarafally has filed a Motion for Sentence Adjustment[3] in which he seeks a six month reduction in sentence on the ground that as a deportable alien, his sentence will be served under circumstances more severe than those facing a similarly situated United States citizen/defendant.[4]  Finally, Hasarafally filed a

---

[2]    This statement was subsequently memorialized in the Judgment and Commitment ("J&C").  *See* J&C at 2 of 5 ("The defendant is a citizen of Surinam, and is subject to deportation upon completion of the term of imprisonment.").  According to Hasarafally, he is a United States citizen, not an alien subject to deportation for having committed a felony.

[3]    *See* Docket Entry # 39 in case number S1 05 CR 401(MBM).

[4]    *See* Motion for Sentence Adjustment at 1(stating that because of his status as a deportable alien, Hasarafally is ineligible to: participate in the residential drug abuse program; and receive a timely halfway house release).  This apparent admission of alienage contradicts the due process arguments raised in Hasarafally's Petition, in which he argues that the Government lacks the power to deport him because he is not an alien.  *See* Memorandum of Law in Support of Movant's Motion to Vacate, Set Aside or Correct His Sentence Pursuant to Title 28 U.S.C. Section 2255 ("Pet. Mem.") at 10-11.  Thus, the arguments raised in the Petition are better understood as a challenge to deportation itself rather than Judge Mukasey's identification of petitioner as an alien.

motion to amend his Petition to assert a third ineffective assistance of counsel claim based on his attorney's alleged failure to properly advise him of the benefits of pleading guilty.[5]   For the following reasons, the Petition is denied on the merits as is the Motion for Sentence Adjustment.  The Motion to Amend is denied as untimely.

## I.      BACKGROUND

### A.      Overview of the Government's Case-in-Chief

Hasarafally and co-defendant Danny Ranchurejee were kilogram-level cocaine dealers who had a short-lived relationship with another cocaine trafficker who became a cooperating witness (the "CW") for the Government.  In February 2005, Ranchurejee, with the assistance of Hasarafally, purchased approximately two kilograms of cocaine from the CW.  At the time, the CW had not yet been arrested and was not cooperating with the Government.  About a month later, in early April 2005, the CW was apprehended and immediately agreed to cooperate with the Drug Enforcement Administration ("DEA").  Acting at the DEA's direction, the CW made recorded telephone calls in which he arranged to purchase three kilograms of cocaine from Ranchurejee.  On April 5, 2005, the date set for the exchange, Hasarafally met Ranchurejee at a predetermined location.  After

---

[5]      *See* Motion to Amend § 2255 Pursuant to Fed. R. Civ. P. 15(a)(2) ("Motion to Amend") (Docket Entry # 41 in case number S1 05 CR 401(MBM)).

remaining under surveillance for some time, the two men were arrested.  Inside

Hasarafally's car, agents found a knapsack containing a scale and nearly three

kilograms of cocaine.  Telephone records and one of Ranchurejee's recorded

conversations with the CW confirmed Hasarafally's involvement in the drug deal.

### 1.    The February 2005 Deal

The CW testified pursuant to a cooperation agreement in the

Government's case-in-chief against Hasarafally.  The CW stated that he became

involved in cocaine trafficking in late 2004, when he learned that his girlfriend was

receiving shipments of cocaine from her family in Guyana.[6]  The CW obtained

Ranchurejee's name and telephone number from connections he had in Guyana.[7]

In late February 2005, the CW arranged to sell two kilograms of cocaine to

Ranchurejee.[8]  A couple of days after the sale, Ranchurejee called the CW and

complained that one of the kilograms was eighty grams short.[9]  Although he

disagreed with the alleged inaccuracy in weight, the CW agreed to make up the

---

[6]        *See* Trial Transcript ("Tr.") at 89-91.

[7]        *See id.* at 107.

[8]        *See id.* at 116-117.

[9]        *See id.* at 118.

shortage.[10]  Ranchurejee told the CW that he would send someone to pick it up.[11]

Shortly thereafter, the CW met Hasarafally who was seated in a brown Honda

Accord when he arrived.[12]  When the CW reiterated that quantity shortages were

unusual for him, Hasarafally replied that he had to take it up with Ranchurejee.[13]

The CW then gave a bag containing one hundred grams of cocaine to Hasarafally.[14]

All of this transpired before the CW was arrested and started cooperating with the

Government.

### 2.      The April 5, 2005 Deal

On March 31, 2005, the CW was arrested after attempting to sell

nineteen kilograms of cocaine to an undercover agent.[15]  After his arrest, the CW

immediately began cooperating with the Government.  As part of his cooperation,

the CW arranged drug deals by making recorded calls to numbers stored in his cell

phone.[16]  One of those telephone contacts was Ranchurejee.  In a series of calls

---

[10]      *See id.* at 119.

[11]      *See id.*

[12]      *See id.*

[13]      *See id.* at 123.

[14]      *See id.*

[15]      *See id.* at 23-24.

[16]      *See id.* at 25, 100.

from April 3 to April 5, 2005, the CW arranged to purchase several kilograms of cocaine from Ranchurejee.[17]  In those calls, Ranchurejee discussed the quantity, price, date, and place for the transaction.  Ranchurejee originally intended to supply four kilograms of cocaine as early as April 4, 2005,[18] but he later told the CW that he only had three kilograms to sell.[19]  Ranchurejee and the CW then agreed to meet on April 5, 2005, at a location in Queens.[20]  Ranchurejee did not mention Hasarafally by name in any of those conversations.

DEA Special Agents Michael Murphy and Ramon Perez established advance surveillance in the area of the meeting.[21]  At the expected time of the meeting, Agent Murphy saw a brown Honda Accord arrive.[22]  Approximately ten minutes later, Agent Murphy saw a Lincoln Navigator arrive and park in front of the Honda.[23]  Ranchurejee emerged from the Navigator, approached the driver's side of the Honda, spoke briefly with the driver for a minute, then walked off

---

[17]    *See id.* at 27, 107-109.

[18]    *See id.* at 111.

[19]    *See id.* at 111-112.

[20]    *See id.* at 115.

[21]    *See id.* at 28, 52-53.

[22]    *See id.* at 54.

[23]    *See id.* at 54-55.

empty-handed.[24]

       Not long after walking away, Ranchurejee went back to the Honda and entered the front passenger side, empty-handed.[25]  The Honda pulled out and drove for about a block before it was stopped by law enforcement.[26]  Hasarafally was in the driver's seat.[27]  Agent Murphy looked inside the Honda and saw a knapsack on top of the back seat.[28]  A search of the knapsack revealed what was later determined to be approximately three kilograms of cocaine and a digital scale commonly used to weigh drugs.[29]  At trial, Agent Murphy testified as follows:

> Q.    At that point, did you yourself know what was in the knapsack?
>
> A.    No, I did not.
>
> Q.    Did you come to open the knapsack?
>
> A.    After I asked Mr. Hasarafally, I walked towards Ranchurejee, and I was going to ask him if it was his knapsack, and before I took two steps he yelled out,

---

[24]    *See id.* at 55-56.

[25]    *See id.* at 56.

[26]    *See id.* at 58.

[27]    *See id.* at 58-59.

[28]    *See id.* at 59.

[29]    *See id.* at 64-67.

"It belongs to him," and pointed at Hasarafally.[30]

Defense counsel immediately objected.  At sidebar, when Judge Mukasey asked counsel what remedy he sought, counsel asked the Court to "instruct the jury that they are not to consider the statement by Ranchurejee for any purpose and to strike it."[31]  The Court complied by providing the following instruction:

> THE COURT:  Ladies and gentlemen, the statement that this witness attributed to Mr. Ranchurejee is not to be considered for any purpose at all in deciding this case.  It's stricken.  I told you earlier on that there might be testimony that was stricken.  This is that kind of testimony.  So you are not to consider it in deciding the facts of the case.[32]

The arresting agents also recovered cell phones from Hasarafally and Ranchurejee.[33]  Telephone records for those phones reflect that 145 calls were made between Hasarafally and Ranchurejee in the ten days leading up to the April 5, 2005 transaction.[34]  The records also show that several additional calls were placed between Ranchurejee and Hasarafally in the late morning and afternoon of April 5, 2005.

------------

[30]  *Id.* at 61.

[31]  *Id.* at 62.

[32]  *Id.* at 64.

[33]  *See id.* at 67-68.

[34]  *See id.* at 195.

### B.     The Jury's Verdict

On April 19, 2006, the jury returned a guilty verdict.  By special verdict, the jury found that the offense conduct involved at least 500 grams but less than five kilograms of cocaine.[35]  At Hasarafally's request, the court asked the jury to report whether "your verdict was based on the events of April 5 or whether it was based on the earlier events."[36]  The jury responded that "the amount of narcotics relates to the events of April 5, 2005."[37]

### C.     The Sentencing Proceedings

Prior to sentencing, the United States Probation Office prepared a Presentence Investigation Report ("PSR").  The Probation Office determined that Hasarafally was responsible for approximately five kilograms of cocaine, yielding a base offense level of 32.[38]  Because Hasarafally fell into Criminal History Category I, the resulting sentencing range was 121 to 151 months imprisonment.[39]  Of relevance to the instant Petition, the PSR noted that Hasarafally is a citizen of

---

[35]     *See id.* at 371.

[36]     *Id.*

[37]     *Id.*

[38]     *See* PSR ¶ 17.

[39]     *See id.* ¶¶ 17, 26, 31.

Surinam and provided his U.S. alien registration number.[40]  Hasarafally did not

object to this information prior to or at sentencing.

On August 29, 2006, Hasarafally appeared before Judge Mukasey for

sentencing.   Contrary to the Probation Office's recommendation, the court found

that the defendant was responsible for more than 3.5 kilograms but less than five

kilograms of cocaine, corresponding to base offense level 30.  The court then

added a two-level enhancement for obstruction of justice because Hasarafally gave

extensive, false testimony at trial.   Judge Mukasey then departed downward to

level 29 because Hasarafally's participation in the conspiracy was relatively brief

and he did not control the quantity of drugs involved.  Judge Mukasey ultimately

sentenced Hasarafally to 96 months incarceration, the middle of the applicable

United States Sentencing Guidelines range.[41]

At sentencing, Judge Mukasey made the following statement in

connection with the imposition of supervised release:

> He is not a U.S. citizen and, therefore, I would think it is
> likely he will be deported following service of his sentence.
> The cost of supervision is moot.   In the event that
> [deportation] should not happen, he will pay the cost of
> supervision at such time as it comes, as his income exceeds

---

[40]      *See id.* at 1.

[41]      Hasarafally does not challenge the Court's Guidelines calculations in
the instant Petition.

$3,000 after taxes, and then to the extent of ten percent.[42]

In the "Supervised Release" section of Hasarafally's J&C, Judge Mukasey noted:

> The defendant is a citizen of Surinam and is subject to
> deportation upon completion of the term of imprisonment.
> In the instance that the defendant is not deported, he shall
> pay the cost of supervision when his income exceeds
> $3,000 per month after taxes, and then to the extent of
> 10%.[43]

## II.   LEGAL STANDARDS

### A.   Section 2255

Section 2255 permits a convicted person held in federal custody to

petition the sentencing court to vacate, set aside, or correct a sentence.  A properly

filed motion under Section 2255 must allege that: (1) the sentence was imposed in

violation of the Constitution or laws of the United States; (2) the sentencing court

was without jurisdiction to impose a sentence; (3) the sentence was in excess of the

maximum authorized by law; or (4) the sentence is otherwise subject to collateral

attack.[44]  Accordingly, collateral relief under Section 2255 is permitted "only for a

constitutional error, a lack of jurisdiction in the sentencing court, or an error of law

or fact that constitutes 'a fundamental defect which inherently results in a complete

---

[42]     Transcript of Sentencing on August 29, 2006 ("Sent. Tr.") at 12.

[43]     J&C at 3 of 5.

[44]     *See* 28 U.S.C. § 2255.

miscarriage of justice.'"[45]

## B.   Ineffective Assistance of Counsel

A petitioner seeking to attack his sentence based on ineffective assistance of counsel must: (1) show that counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms," and (2) "affirmatively prove prejudice," namely, demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[46]

When analyzing a claim that counsel's performance did not meet constitutional standards, "judicial scrutiny of counsel's performance must be highly deferential."[47]  The court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[48]  "In assessing the attorney's performance, a reviewing court must judge his conduct on the basis of the facts of the particular case, 'viewed as of the time of counsel's

---

[45]   *Cuoco v. United States*, 208 F.3d 27, 29 (2d Cir. 2000) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)).

[46]   *Strickland v. Washington*, 466 U.S. 668, 693–94 (1984).

[47]   *Id.* at 689.

[48]   *Id.*

conduct,' and may not use hindsight to second-guess his strategy choices."[49]

Constitutionally inadequate performance may be established if a habeas petitioner

"shows that counsel omitted significant and obvious issues while pursuing issues

that were clearly and significantly weaker."[50]  Nonetheless, "[t]he failure to include

a meritless argument does not fall outside the wide range of professionally

competent assistance to which [a] [p]etitioner [i]s entitled."[51]  Finally, even if an

attorney's performance was objectively unreasonable and unprofessional, a

petitioner must still prove prejudice.[52]  As explained by the Supreme Court, the

order of analysis of the two *Strickland* prongs is at the discretion of the court:

> Although we have discussed the performance component of
> an ineffectiveness claim prior to the prejudice component,
> there is no reason for a court deciding an ineffective
> assistance claim to approach the inquiry in the same order
> or even to address both components of the inquiry if the
> defendant makes an insufficient showing on one. In
> particular, a court need not determine whether counsel's
> performance was deficient before examining the prejudice
> suffered by the defendant as a result of the alleged
> deficiencies.  The object of an ineffectiveness claim is not

---

[49]    *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (quoting *Stickland*, 466 U.S. at 690).

[50]    *Clark v. Stinson*, 214 F.3d 315, 322 (2d Cir. 2000).

[51]    *Aparicio v. Artuz*, 269 F.3d 78, 99 (2d Cir. 2001) (quotation marks and citations omitted).

[52]    *See Stickland*, 466 U.S. at 687.

13

to grade counsel's performance.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.[53]

## C.    The *Crawford* Standard

In *Crawford v. Washington*,[54] the Supreme Court held that the Sixth Amendment prohibits the admission of out-of-court testimonial statements by a witness unless the declarant is available for cross-examination.[55]  Surveying Sixth Amendment jurisprudence, the Court concluded that where "testimonial" statements are involved, the previous approach of "[a]dmitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation."[56]

---

[53]     *Id.* at 697, 693 ("Even if a defendant shows that particular errors of counsel were unreasonable, . . . the defendant must show that they actually had an adverse effect on the defense. . . [and] there is no reason . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."). *Accord  Farrington v. Senkowski*, 214 F.3d 237, 242 (2d Cir. 2000) (stating that courts need not resolve the *Strickland* performance prong if the prejudice prong is more readily resolved).

[54]     541 U.S. 36 (2004).

[55]     *See id.* at 68 ( "Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.").

[56]     *Id.* at 61.

The Court held that where the Government offers "testimonial" statements, the Confrontation Clause of the Sixth Amendment "demands what the common law required: unavailability and a prior opportunity for cross-examination,"[57] regardless of how reliable the statement may be.[58]  *Crawford* emphasized that although the "ultimate goal" of the Confrontation Clause was clearly "to ensure reliability of evidence," the Clause did not confer a substantive guarantee of reliability.[59]  Rather, the Confrontation Clause provides for a procedural guarantee by commanding "not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination."[60]

Accordingly, "where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation."[61]  However, the *Crawford* Court

---

[57]     *Id.* at 68.

[58]     *See id.* at 62 ("Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty.  This is not what the Sixth Amendment prescribes.").

[59]     *Id.* at 61.

[60]     *Id.*

[61]     *Id.* at 68-69.

carefully limited its holding to "testimonial" statements.[62]   And even "testimonial"

statements may be admitted without violating the Confrontation Clause if they are

offered "for purposes other than establishing the truth of the matter asserted."[63]

Shortly after *Crawford* was decided, the Second Circuit confronted

the question of whether statements made by a declarant to a confidential informant,

whose true identity was unknown to the declarant, constituted "testimony" for

purposes of the Confrontation Clause.[64]   At the trial in *United States v. Saget*, the

Government offered testimony against the defendant (Saget) consisting of

statements made by a separately indicted co-conspirator (Beckham) to a

confidential informant ("CI"), despite the fact that Beckham was unavailable to

_____

[62]      *See id.* at 68 ("Where nontestimonial hearsay is at issue, it is wholly
consistent with the Framers' design to afford the States flexibility in their
development of hearsay law . . . as would an approach that exempted such
statements from Confrontation Clause scrutiny altogether.").

[63]      *Id.* at 59 n.9 (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)).
*Accord United States v. Goldstein*, 442 F.3d 777, 785 (2d Cir. 2006) (same);
*United States v. Stewart*, 433 F.3d 273, 291 (2d Cir. 2006) (same).

[64]      *See United States v. Saget*, 377 F.3d 223, 228 (2d Cir. 2004) ("[A co-
conspirator's statements were elicited by an agent of law enforcement officials, but
without his knowledge, and not in the context of the structured environment of
formal interrogation.  The question, therefore, is whether [the co-conspirator]
served as a 'witness' who bears testimony within the meaning of the Clause,
despite the fact that he was unaware that his statements were being elicited by law
enforcement and would potentially be used in a trial [or future judicial
proceeding].").

testify at trial.[65]  Although the Supreme Court did not exhaustively define what it meant by "testimonial" statements in *Crawford*, "it provided examples of those statements at the core of the definition, including prior testimony at a preliminary hearing, previous trial, or grand jury proceeding, as well as responses made during police interrogations."[66]  "Thus, the types of statements cited by the Supreme Court as testimonial share certain characteristics: all involve a declarant's knowing responses to structured questioning in an investigative environment or a courtroom setting where the declarant would reasonably expect that his or her responses might be used in future judicial proceedings."[67]

The Second Circuit observed that "*Crawford* at least suggests that the determinative factor in determining whether a [statement is testimonial] is the declarant's awareness or expectation that his or her statements may later be used at a trial."[68]  The *Saget* court concluded "that a declarant's statements to a confidential informant, whose true status is unknown to the declarant, do not constitute testimony within the meaning of *Crawford*."[69]  Accordingly, the

---

[65]     *See id.* at 224.

[66]     *Id.* at 228.

[67]     *Id.*

[68]     *Id.*

[69]     *Id.* at 229

statements made by Beckham (the declarant) to the CI were not testimonial

because the declarant had no knowledge he was talking to a Government agent, but

rather thought he was having a "casual conversation with a friend and potential

co-conspirator."[70]  Because Beckham's statements to the CI were not testimonial,

*Crawford* did not bar their admission against Saget.[71]

       Violations of the Confrontation Clause, even "if preserved for

appellate review, are subject to harmless error review, . . . and *Crawford* does not

suggest otherwise."[72]  In reviewing Confrontation Clause violations for harmless

error, courts should evaluate a "host of factors," including "the importance of the

witness' testimony in the prosecution's case, whether the testimony was

cumulative, the presence or absence of evidence corroborating or contradicting the

testimony of the witness on material points, the extent of cross-examination

otherwise permitted, and, of course, the overall strength of the government's

case."[73]  No one factor is dispositive, but "'[t]he strength of the prosecution's case

---

[70]    *Id.*

[71]    *See id.* at 229-30.

[72]    *United States v. McClain*, 377 F.3d 219, 222 (2d Cir. 2004).  *Accord United States v. Reifler*, 446 F.3d 65, 87 (2d Cir. 2006); *United States v. Tropeano*, 252 F.3d 653, 659 (2d Cir. 2001).

[73]    *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986).

is probably the single most critical factor.'"[74]

### D.    Amendments to Habeas Petitions

In *Mayle v. Felix*,[75] the United States Supreme Court addressed the intersection of Federal Rule of Civil Procedure 15 ("Rule 15") and the one-year limitation period imposed on federal habeas petitioners by the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA").  In *Mayle*, the question presented was whether an amended habeas petition, filed after the AEDPA's one-year limitation period and targeting the defendant's pretrial statements, related back to the date of the defendant's original timely filed habeas petition, which targeted videotaped witness testimony.[76]  The Supreme Court answered this question in the negative, holding that an amended habeas petition "does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth."[77]  The Supreme Court explained as follows:

---

[74]    *Reifler*, 446 F.3d at 87 (quoting *Latine v. Mann*, 25 F.3d 1162, 1167-68 (2d Cir. 1994)).

[75]    545 U.S. 644 (2005).

[76]    *See id.* at 649.

[77]    *Id.*

> This case turns on the meaning of Federal Rule of Civil Procedure 15(c)(2)'s relation-back provision in the context of federal habeas proceedings and AEDPA's one-year statute of limitations. Rule 15(c)(2) . . . provides that pleading amendments relate back to the date of the original pleading when the claim asserted in the amended plea "arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." The key words are "conduct, transaction, or occurrence." The Ninth Circuit . . . defines those words to allow relation back of a claim first asserted in an amended petition, so long as the new claim stems from the habeas petitioner's trial, conviction, or sentence. Under that comprehensive definition, virtually any new claim introduced in an amended petition will relate back, for federal habeas claims, by their very nature, challenge the constitutionality of a conviction or sentence, and commonly attack proceedings anterior thereto.[78]

Rejecting the approach taken by the Ninth Circuit, the Court stated that "[s]o long as the original and amended petitions state claims that are tied to a common core of operative facts, relation back will be in order."[79]  The relation back doctrine

---

[78]     *Id.* at 656-67.  Rule 15(c)(1)(B) was Rule 15(c)(2) prior to the December 1, 2007 Amendment to the Federal Rules of Civil Procedure.  Rule 15(c)(1)(B) states: "An amendment to a pleading relates back to the date of the original pleading when . . . (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out . . . in the original pleading[.]" This language is nearly identical to that of former Rule 15(c)(2). Thus, the two citations are interchangeable.

[79]     *Mayle*, 545 U.S. at 664.

20

described in *Mayle* has been applied repeatedly by courts in this Circuit.[80]

## III.   DISCUSSION

### A.   Hasarafally's Counsel Was Not Constitutionally Ineffective with Regard to Ranchurejee

#### 1.   Ranchurejee's Admitted Out-of-Court Statements

Hasarafally complains that his counsel should have objected to the introduction of Ranchurejee's out-of-court statements.  Ranchurejee's out-of-court statements consisted of:  (1) his statements to the CW regarding the February 2005 two-kilogram cocaine transaction, which occurred before the CW started to cooperate; (2) his recorded conversations with the CW about the April 2005 three-kilogram deal, which occurred while the CW, unbeknownst to Ranchurejee, was cooperating; and (3) his statement to Agent Murphy that the knapsack holding the cocaine belonged to Hasarafally.

Ranchurejee's first statements regarding the two-kilogram deal were made in furtherance of the charged conspiracy.  Hence, they were admissible as

---

[80]   *See, e.g., Gibson v. Artus*, 407 Fed. App'x 517, 519 (2d Cir. 2010) ("In *Mayle v. Felix*, the Supreme Court limited claims in an amended petition to those that arose from the same core facts alleged in the original petition, not those related generally to petitioner's trial, conviction, or sentence."); *Hoffenberg v. United States*, 333 Fed. App'x 625 (2d Cir. 2009); *Ermichine v. United States*, No. 06 Civ. 10208, 2011 WL 1842951, at *11 (S.D.N.Y. May 12, 2011); *Freeman v. United States*, No. 09 Civ. 4087, 2010 WL 4026067, at *2 (S.D.N.Y. Oct. 14, 2010); *Martin v. United States*, No. 08–CV–452, 2011 WL 5507423, at *5 (E.D.N.Y. Nov. 9, 2011).

co-conspirator statements pursuant to Federal Rule of Evidence 801(d)(2)(E).  The

admission of those statements did not run afoul of *Crawford* because they were not

testimonial; there was nothing in the record to suggest that Ranchurejee had any

reason to think those statements would be used in a judicial proceeding.

   Similarly, because Ranchurejee's recorded conversations with the CW

regarding the three-kilogram deal were also non-testimonial, their admission did

not violate *Crawford*.  It is obvious from the substance of the recorded

conversations, and Ranchurejee's delivery of the three kilograms of cocaine, that

Ranchurejee did not know he had been speaking with a CI.  That is the decisive

factor.  In the absence of a finding that the challenged statements are testimonial

under *Crawford*, the Confrontation Clause does not preclude the admission of such

testimony.[81]  In short, because  there was no valid basis for objecting to the

admission of Ranchurejee's out-of-court statements, Hasarafally's counsel cannot

be constitutionally defective for failing to do so.

   Counsel did object to Ranchurejee's statement to Agent Murphy that

the knapsack holding the cocaine belonged to Hasarafally.  Counsel asked the

Court to strike that portion of Agent Murphy's testimony and the Court promptly

---

[81] *See Davis v. Washington*, 547 U.S. 813, 825 (2006) (citing *Bourjaily v. United States*, 483 U.S. 171, 181-84 (1987), with approval as involving "clearly nontestimonial" statements); *Crawford*, 541 U.S. at 58; *Saget*, 377 F.3d at 229.

did so.[82]  Juries are presumed to follow the Court's instructions.[83]  In light of

counsel's immediate objection to Ranchurejee's statement at the time of arrest,

which resulted in a prompt curative instruction from the District Court, counsel

cannot be found to have acted below any objective standard of reasonableness.

### 2.    Counsel's Failure to Call Ranchurejee as a Witness

Hasarafally also claims that his counsel was constitutionally

ineffective because counsel had the opportunity to have Ranchurejee present at

trial, but failed to call him as a witness.[84]  The Court interprets this argument to

mean that counsel should have compelled Ranchurejee to testify as a witness on

Hasarafally's behalf.  This argument is flawed.  As an initial matter, although

Ranchurejee had pleaded guilty by the time of Hasarafally's trial, Ranchurejee was

not sentenced until four months after that trial.  Thus, there was a strong likelihood

that Ranchurejee would have invoked his right against self-incrimination and

---

[82]    *See* Tr. at 62-64.

[83]    *See Zafiro v. United States*, 506 U.S. 534, 540-41 (1993) ("'[J]uries
are presumed to follow their instructions.'") (quoting *Richardson v. Marsh*, 481
U.S. 200, 211 (1987)).  *Accord United States v. Snype*, 441 F.3d 119, 129-30 (2d
Cir. 2006) (recognizing the strong presumption that jurors follow limiting
instructions).

[84]    *See* Pet. Mem. at 7.

refused to testify.[85]

Even if Ranchurejee were amenable to testifying, however, counsel cannot be deemed ineffective for not calling upon him to do so.  "'The decision not to call a particular witness is typically a question of trial strategy.'"[86]  The decision not to call Ranchurejee was well "within the range of acceptable strategic and tactical alternatives."[87]  Ranchurejee had already incriminated Hasarafally by telling Agent Murphy at the time of his arrest that the cocaine-filled knapsack belonged to Hasarafally.  Counsel had succeeded in having that statement stricken from the record.  To then call Ranchurejee as a witness would have created a grave risk that Ranchurejee would repeat the same accusation and/or provide other devastating testimony against Hasarafally.  Considering those circumstances, far from being ineffective, counsel made a sound strategic choice in not having Ranchurejee testify.

---

[85]    *See, e.g., United States v. Jackson*, 335 F.3d 170, 177 n.1 (2d Cir. 2003) ("It is well established that a witness may invoke his Fifth Amendment right, and is therefore unavailable for purposes of Rule 804(b), during the time lapse between his plea and sentencing.").

[86]    *Bierenbaum v. Graham*, 607 F.3d 36, 55 (2d Cir. 2010) (quoting *Greiner v. Wells*, 417 F.3d 305, 323 (2d Cir. 2005)).

[87]    *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998).

### 3.     No Prejudice

Even if counsel were ineffective, Hasarafally's Petition must still be denied because he cannot show prejudice, *i.e.*, that the outcome of the trial would have been different but for counsel's alleged shortcomings.  Any objection to Ranchurejee's statements to the CW about the February 2005 two-kilogram deal or Ranchurejee's recorded statements to the CW about the April 2005 three-kilogram sale would have been fruitless.  Thus, even if counsel had objected, his objections would have been overruled.

Significantly, there was sufficient evidence apart from Ranchurejee's statements to convict Hasarafally.  Agents Perez and Murphy both testified that Ranchurejee had not been carrying anything that even approximated the size of the cocaine-carrying knapsack that was eventually recovered from the car that Hasarafally drove.[88]   Thus, the cocaine had to have been in the car already when Hasarafally arrived.  A reasonable jury could have inferred Hasarafally's guilt from his presence in the Honda when the transaction was about to occur and the phone records showing more than one hundred calls between him and Ranchurejee in the days preceding the sale.  On this record, it cannot be said that the exclusion of Ranchurejee's challenged statements – in which Hasarafally's name was never

---

[88]      *See* Tr. at 42, 55-56.

25

mentioned – would have resulted in a not guilty verdict.[89]

Similarly, counsel's decision not to call Ranchurejee as a defense witness did not prejudice Hasarafally.  Because Ranchurejee had not yet been sentenced, he most likely would have invoked his Fifth Amendment right against self-incrimination.  Indeed, the fact that Ranchurejee did not testify for the Government, and thereby potentially qualify for a reduced sentence, was a strong indicator that he would have invoked his Fifth Amendment right.  More importantly, Ranchurejee's testimony would likely have been more damaging than helpful to Hasarafally.  Thus, counsel's failure to call Ranchurejee as a witness did not prejudice Hasarafally.  Accordingly, both of Hasarafally's original ineffective assistance of counsel claims are without merit and must be dismissed.

## B.  Hasarafally's Due Process Rights Were Not Violated

Hasarafally claims that the District Court violated his Due Process rights by declaring at sentencing that he is likely to be deported after he completes his term of imprisonment.[90]   Hasarafally contends that he has consequently been placed in "an INS holding institution in Big Spring, Texas,"[91] and "seeks to

---

[89]     *See Glenn v. Bartlett*, 98 F.3d 721, 729 (2d Cir. 1996) (harmless error where there was other "weighty" evidence).

[90]     *See* Pl. Mem. at 8-12.

[91]     *Id.* at 11.

challenge his removal from the United States."[92]   Hasarafally's due process claim

is both factually inaccurate and legally without merit.

### 1.    Hasarafally's Factual Assertions Are Wrong

Contrary to Hasarafally's assertion, a review of the Immigration and

Customs Enforcement ("ICE") records indicates that he is, in fact, an alien.

Hasarafally is a permanent resident alien of the United States and a citizen of

Surinam.  Hasarafally claims that he "passed the American Citizenship Exam in

2006" and "has lived in the United States since the age of fourteen."[93]  Assuming

those contentions to be true, it does not follow that Hasarafally thereby became a

United States citizen.  For example, Hasarafally does not claim that:  an

Immigration and Citizenship Services officer has determined that his citizenship

application should be granted; that he took the oath of renunciation and allegiance;

or that he received a certificate of naturalization.  Because Hasarafally is an alien

convicted of a felony drug offense, Judge Mukasey properly informed him, and the

J&C correctly stated, that he is subject to deportation.[94]

_____

[92]      *Id.* at 12.

[93]      *Id.* at 11.

[94]      *See* 8 U.S.C. § 1101(a)(43)(B) (defining "aggravated felony" to
include "illicit trafficking in a controlled substance"); 8 U.S.C. § 1227(a)(2)(A)(iii)
("Any alien who is convicted of an aggravated felony at any time after admission is
deportable."); 8 U.S.C. § 1227(a)(2)(B) ("Any alien who at any time after

To the extent Hasarafally believes that Judge Mukasey's comment at sentencing, or the notation in the J&C, constitutes an order of deportation, he is mistaken.  Neither constitutes an order of deportation.  Judge Mukasey was simply advising Hasarafally that as an aggravated felon, he is deportable.  In fact, it is questionable whether the District Court had jurisdiction to order Hasarafally's removal as part of his criminal sentence absent a specific pre-sentence request from the United States Attorney.   No such request was made in advance of sentencing in this case.

Hasarafally's assertion that he has been placed in an "INS holding institution" is also inaccurate.[95]   He has been designated to the Big Spring Correctional Center ("Big Spring") in Texas, which is a private facility under contract to the Bureau of Prisons ("BOP").  Although Big Spring houses many inmates who are deportable aliens, it is not an ICE holding center.  Thus, an inmate's designation to the Big Spring facility does not amount to a determination that the inmate will be deported/removed from the United States.

---

admission has been convicted of a violation of (or a conspiracy or attempt to violate) any law . . . relating to a controlled substance . . . is deportable."); 8 U.S.C. § 1228(c) ("An alien convicted of an aggravated felony shall be conclusively presumed to be deportable from the United States.").

[95]     Pl. Mem. at 11.

### 2.   Hasarafally's Due Process Claim is Not Ripe

To the extent that Hasarafally claims that he will be deported without due process, that claim is unripe.  It is, of course, well established that "'the Fifth Amendment entitles aliens to due process of law in deportation proceedings.'"[96] In this case, however, Hasarafally's due process claim must be dismissed as not yet ripe.  Although ICE has lodged a detainer against him, no order of deportation or removal has been issued to date.  According to ICE, Hasarafally qualifies for the Institutional Hearing Program ("IHP") for deportable aliens.  The IHP is a program created to ensure that aliens convicted of aggravated felonies are expeditiously removed after completing their term of imprisonment, with the goal of avoiding an additional period of detention at an ICE facility pending deportation/removal proceedings.[97]  Those proceedings "shall be conducted in conformity with section 1229a of [Title 8.]"[98]  Section 1229a, in turn, specifies how removal proceedings shall be conducted and accords the alien notice, an opportunity to be heard by an

---

[96]    *Demore v. Kim*, 538 U.S. 510, 523 (2003) (quoting *Reno v. Flores*, 507 U.S. 292 (1993)).

[97]    *See generally* 8 U.S.C. § 1228 (entitled "Expedited removal of aliens convicted of committing aggravated felonies").

[98]    8 U.S.C. § 1228(a)(1).

immigration judge, the right to counsel, and the right to an administrative appeal.[99]

Thus, Hasarafally will have an opportunity to explain why he should not be

deported and offer any proof of U.S. citizenship he may have.  Hasarafally will

have a ripe due process claim only if he is ordered to be deported/removed in

contravention of these procedures.  At this juncture, however, his due process

claim is premature and must be denied.

### C.   Hasarafally's Motion for Sentence Adjustment Is Without Merit

Hasarafally claims that he is ineligible to participate in the BOP's

residential drug abuse treatment program because of his status as a deportable

alien.[100]  He also claims that, as a result of such status, he is ineligible to serve his

sentence in a minimum security facility, nor can he serve the last ten percent of his

sentence in a halfway house.[101]  Hasarafally thus argues that he is entitled to a six-

month reduction in sentence pursuant to *Restrepo v. United States*.[102]

---

[99]    *See generally* 8 U.S.C. § 1229a (entitled "Removal proceedings").

[100]    *See* Motion for Sentence Adjustment at 1.

[101]    *See id.* at 2.

[102]    802 F. Supp. 781 (E.D.N.Y. 1992).  In *Restrepo*, the district court
granted the defendant a downward departure based on his status as an alien.  The
court noted that "the defendant faces an extraordinarily severe penalty in addition
to incarceration for a longer period of time and under far more difficult
circumstances than those generally faced by a United States citizen who committed
the same offense.  A sentence at the low end of the applicable guideline range does

The downward departure granted by the district court in *Restrepo* was vacated by the Second Circuit on appeal.[103]  The Second Circuit did not state categorically that a defendant's alien status could never be considered in deciding whether to downwardly depart.  Rather, the court found that a downward departure was inappropriate because the defendant failed to cite any consequences of alienage not faced by every other alien subject to deportation.

> [W]e decline to rule that pertinent collateral consequences of a defendant's alienage could not serve as a valid basis for departure if those consequences were extraordinary in nature or degree.  Resolution of that question, however, is unnecessary to this appeal, for we conclude that none of the bases relied on by the district court, *i.e.*, (1) the unavailability of preferred conditions of confinement, (2) the possibility of an additional period of detention pending deportation following the completion of sentence, and (3) the effect of deportation as banishment from the United States and separation from family, justified the departure.[104]

This holding has been reaffirmed in *United States v. Duque*, where the court stated:

> The collateral effects of deportability – *e.g.*, (1) the unavailability of preferred conditions of confinement, [and] (2) the possibility of an additional period of detention pending deportation following the completion of sentence

---

not adequately take account of this additional penalty.  Accordingly, some downward departure is necessary in order to impose a sentence that is not unreasonably harsh under all the circumstances of the case." *Id.* at 793.

[103]   *See United States v. Restrepo*, 992 F.2d 640 (2d Cir. 1993).

[104]   *Id.*  at 644.

> – generally do not justify a departure from the Guidelines range.   While it is true that pertinent collateral consequences of a defendant's alienage might serve as a valid basis for departure if those consequences were extraordinary in nature or degree[,] the collateral effects at issue here are run of the mill.[105]

Thus, the collateral consequences of alien status may justify a downward departure at sentencing if those consequences are extraordinary in nature or degree.  A similar analysis is employed in post-*Booker* cases.

> We have recently stated that a non-Guidelines sentence that rests primarily upon factors that are not unique or personal to a particular defendant, but instead reflects attributes common to all defendants should therefore be viewed as inherently suspect.   We believe that a non-Guidelines sentence that purportedly rests on the judge's prediction that a defendant will be deported, a factor applicable to a wide class of criminal defendants, should be treated in the same way.  The district judge's oral statement of reasons (and his subsequent written statement of reasons as well) gives no indication that anything but the bare fact of deportation was considered. It may be that a sentencing judge can consider deportation when he or she identifies, with some particularity, why a specific defendant is certain to be deported and why deportation, in light of that defendant's individual circumstances, will serve to protect the public. Because deportation may not be viewed as additional punishment and the district court noted only the bare fact of deportation in its statement of reasons, the district court erred as a matter of law in factoring into Wills's sentence his likely deportation after serving his

---

[105]    256 Fed. App'x 436, 437-38 (2d Cir. 2007) (quotation marks and citations omitted).

prison term.[106]

Thus, where the consequences of alienage are of the type faced by every other alien

defendant, downward departure would be inappropriate, as would a non-Guidelines

sentence.  And if a downward departure/non-Guidelines sentence is not warranted,

certainly a motion for a reduction in sentence is likewise inappropriate.[107]

Accordingly, Hasarafally's Motion for Sentence Adjustment is denied.

### D.   Hasarafally's Motion to Amend Is Untimely

In his Motion to Amend, which was filed on March 26, 2012, more

than two years after he submitted the instant Petition, Hasarafally argues that

"before the onset of trial counsel never informed him of the strengths and

weakness[es] of the case against him, as well as the alternative sentences to which

he would most likely be exposed [].""[108]  Hasarafally thus argues that he received

constitutionally ineffective assistance of counsel "because of counsel's failure to

adequately advise him of the comparative sentence exposure between standing trial

---

[106]   *United States v. Wills*, 476 F.3d 103, 109 (2d Cir. 2007) (quotation
marks and citation omitted).

[107]   *See United States v. Rodriguez-Palomares*, No. 05–CR–1965, 2008
WL 4691843, at *3 (S.D. Ca. Oct. 3, 2012) (denying a motion for a reduction of
the sentence because a downward departure based on deportable alien status was
unavailable under section 2255).

[108]   Motion to Amend at 1 (emphasis deleted).

and accepting a plea offer."[109]  Hasarafally further asserts "that had counsel

informed [him] of said benefits he would have opted to plead guilty instead of

proceeding to trial, wherein he would have ultimately received the acceptance of

responsibility points and subsequently a less harsh sentence."[110]

> While the Motion to Amend cannot be considered a second or

successive petition,[111] whether the claim made therein relates back to the filing of

the original Petition will depend on whether the amended claim and the claims

made in the original Petition are tied to a common core of operative facts.  Here,

the claim in the Motion to Amend is that Hasarafally received ineffective

assistance of counsel in connection with the pre-trial proceedings, namely, plea

negotiations.  Hasarafally's original ineffective assistance claims faulted his

---

[109]    *Id.*

[110]    *Id.* at 2.  *See also* 3/20/12 Affidavit of Ameer Hasarafally, attached to the Motion to Amend.

[111]    "Courts have recognized that, if an initial habeas petition is still pending, a motion to amend – whether related or unrelated to the original claim – should not be viewed as a successive petition."  *Duran v. United States*, Nos. 94 CR. 300, 00 Civ.407, 2002 WL 867864, at *6 (S.D.N.Y. May 3, 2002) (citing *Johnson v. United States*, 196 F.3d 802, 805 (7th Cir. 1999) (holding that, while an initial section 2255 motion is pending, a district court must consider the amendments under the Federal Rules of Civil and Criminal Procedure without regard to sections 2244(b) and 2255); *Newton v. Coombe*, No. 95 Civ. 9437, 2001 WL 799614, at *8 (S.D.N.Y. July 13, 2001) ('Since [the initial habeas] petition has not yet been decided, the motion to amend is not literally a second petition, and so need not navigate the shoals of § 2244(b).').

attorney for conduct which occurred at trial.  Thus, even though the amended claim

and the original claims are both for ineffective assistance of counsel, they do not

arise from the same nucleus of operative facts.  Accordingly, the ineffective

assistance claim made in the Motion to Amend asserts a new ground for relief,

does not relate back to the original Petition, and must be dismissed as untimely.

## IV.   CONCLUSION

For the foregoing reasons, Hasarafally's Petition and Motion for

Sentence Reduction are denied on the merits.  Hasarafally's Motion to Amend in

denied as untimely.  The Clerk of the Court is directed to close the outstanding

motions in the criminal case (Docket Entries # 39 and 41 in case number 05 CR

401 (MBM)) as well as in the civil case (Docket Entry # 1 in case number 10 Civ.

3457 (SAS)).  The Clerk of the Court is further directed to close case number 10

Civ. 3457 (SAS).

The remaining issue is whether to grant a Certificate of Appealability

("COA").  For a COA to issue, a petitioner must make a "substantial showing of

the denial of a constitutional right."[112]  A "substantial showing" does not require a

petitioner to demonstrate that he would prevail on the merits, but merely that

"reasonable jurists could debate whether . . . the petition should have been resolved

---

[112]     28 U.S.C. § 2253(c)(2).

35

in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"[113]  Petitioner has made no such showing. Accordingly, this Court declines to issue a COA with regard to the Petition, the Motion for Sentence Adjustment, and the Motion to Amend.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:        New York, New York
              December 10, 2012

---

[113]        *Slack v. McDaniel,* 529 U.S. 473, 484 (2000) (quoting *Barefoot* v. *Estelle,* 463 U.S. 880, 893 and n.4 (1983) (quotation marks and citations omitted)). *Accord Middleton* v. *Attorneys Gen. of the States of New York and Pennsylvania,* 396 F.3d 207, 209 (2d Cir. 2005) (denying COA where reasonable jurists could not debate whether the district court's dismissal of the petition was correct).

**- Appearances -**

**Petitioner (Pro Se):**

Ameer Hasarafally
# 53098-054
FCI Big Spring
Interstate Unit
1801 W-I-20
Big Spring, TX 79720

**For Respondent:**

Saray Y. Lai
Assistant United States Attorney
One St. Andrew's Plaza
New York, NY 10007
(212) 637-1944